| RAYMOND A. HEARNE, | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) | ORDER |
| | ) |
| UNITED PARCEL SERVICE, INC., | ) |
| Defendant. | ) |

This matter is before the court on Defendant's Motion for Summary Judgment [DE-24].

Plaintiff has responded, Defendant has replied, and this motion is ripe for ruling.

## I. PROCEDURAL HISTORY

Plaintiff Raymond A. Hearne ("Hearne") initiated this action by filing a Complaint in this

court on March 13, 2006, alleging six claims for relief against Defendant United Parcel Service,

Inc. ("UPS"). Specifically, Hearne alleges that he was terminated from employment in violation

of the Age Discrimination in Employment Act, 29 U.S.C. § 621 et seq. ("ADEA"), and North

Carolina public policy as articulated in the North Carolina Equal Employment Practices Act,

N.C. Gen. Stat. § 143-422.2. Hearne also alleges that UPS terminated him to avoid paying him

retirement benefits, in violation of the Employee Retirement Income Security Act, 29 U.S.C. §

1140 ("ERISA"). Finally, Hearn alleges that UPS made a slanderous *per se* statement against

him, intentionally inflicted emotional distress upon him, and was negligent.

UPS filed the instant motion for summary judgment on April 30, 2007. Hearne has

responded, UPS has replied, and therefore the motion is ripe for ruling.

## II. STATEMENT OF THE FACTS

The facts, stated in the light most favorable to Hearne, are as follows:

### A. UPS

UPS is a package delivery company and a global provider of related transportation and logistics services. UPS's operations in the United States are divided into 60 districts. Hearne was assigned to the East Carolina District, which includes the portion of North Carolina generally east of Durham. Dep. of Phillip Allen [DE-27] at p. 46. The East Carolina District is further divided into package distribution "centers" and "hubs." A "package distribution center" is responsible for work at the customer level, including picking up and delivering packages to customers in an assigned territory. Hearne worked in the "Raleigh 2 Center," one of UPS's three package distribution centers in Raleigh. *Id.* at p. 48; Dep. of Raymond Hearne [DE-43] at p. 56.

### B. Collective Bargaining Agreement between UPS and the Teamster's Union

During his employment at UPS, Hearne was a member of the International Brotherhood of Teamsters (the "Teamsters Union"). Dep. of Raymond Hearne [DE-43] at p. 59. As a Teamster, the terms of his employment were governed by the Collective Bargaining Agreement (the "Union Contract") negotiated between UPS and the Teamsters Union. *Id.* at p. 134. The Union Contract contains provisions that govern both discipline for acts of misconduct and the hiring process for Teamster employees. *Id.* at pp. 59-60, 134.

With regard to the hiring of Teamster employees, when a Teamster Union job becomes open, it is filled by operation of the bidding process set forth in the Union Contract. *Id.* at pp. 59-60. Eligible Teamster employees are able to "bid" on the position, and the Teamster with the most seniority is awarded the position. *Id.*

2

## C. Hearne's Employment with UPS

In 1974, while he was still in high school, Hearne was hired by UPS in a part-time position at the Raleigh 2 Center, unloading delivery trucks after school. *Id.* at p. 55. He continued working part-time for UPS until 1981, when he was hired full-time as a package car driver ("PCD"). *Id.* Until his termination in 2005, Hearne remained in a PCD position. *Id.*

As a PCD, Hearne drove one of UPS's familiar brown delivery cars and was responsible for delivering packages to commercial and residential customers along defined delivery routes. Since approximately 2003, Hearne was assigned to a delivery route that serviced the campus of North Carolina State University (the "NC State Route"). *Id.* at pp. 60-61. On a typical day on the NC State Route, Hearne would make about 90 package "delivery" stops (delivering about 150-200 packages) and about 25-30 package "pick-up"stops. *Id.* at pp. 64-65. The parties agree that over the years, Hearne had gained a high level of knowledge about the route and had developed significant rapport and good will with his customers. *Id.* at p. 61. Moreover, according to Hearne, prior to his discharge, he had received only one reprimand over the course of his 30-year career. Hearne states that in February 2003, he was reprimanded for failing to scan packages. Aff. of Raymond Hearne [DE-42] ¶ 4.

## D. The Delivery Information Acquisition Device

UPS PCDs are trained to use a handheld computer called the Delivery Information Acquisition Device ("DIAD") as a means to record, among other things, delivery stops, package deliveries and pick-ups, and time on the job. Dep. of Raymond Hearne [DE-43] at pp. 65-66. The DIAD allows UPS to track a driver's workday in terms of mileage driven, packages delivered, stops made, and hours worked. *Id.* at p. 66.

3

PCDs use the DIAD to scan the unique "bar code" label on each package when it is either delivered or picked up. *Id.* at pp. 65-66. When the bar code is scanned, data is transmitted into UPS's package delivery electronic network, immediately showing that the package has been delivered at that location as of that moment. *Id.* at p. 70. This allows UPS to track the location or any other actions taken with respect to a particular package. *Id.*

The DIAD also enables UPS to provide customers with accurate delivery time and location records. *Id.* at p. 66. Customers access UPS's electronic network via the Internet to track the current status and location of a package. *Id.* Additionally, information entered into the DIAD allows UPS managers to evaluate driver performance and efficiency with respect to package distribution. *Id.* Finally, DIAD data enables UPS managers to evaluate driver workloads and when appropriate, to redistribute work loads as route activity increases or decreases for particular routes. *Id.* at pp. 66-67.

At various points in his career, Hearne attended training sessions on the proper use of the DIAD. *Id.* at p. 67. On March 27, 2003, Hearne signed a "DIAD Recording/Time Card Procedures Sheet" (the "DIAD Procedures Guide"). *Id.* at pp. 68-69, Ex. 5. The DIAD Procedures Guide established the procedures and standards governing the use of the DIAD during Hearne's employment. *Id.* at p. 69.

### E. Compensation at Bonus Centers

UPS contends that to fully understand the circumstances surrounding Hearne's dismissal, it is necessary to understand the compensation system for PCDs at the Raleigh 2 Center. The Raleigh 2 Center is a "Bonus Center." *Id.* at p. 78. At a Bonus Center, driver compensation is based on two time calculations: (1) the "Planned Day" and (2) the "Paid Day." Dep. of Phillip

4

Allen [DE-27] at pp. 24-27.

## 1. The "Planned Day" and "Paid Day"

The "Planned Day" is a calculation intended to match the amount of time it should take a typical PCD to complete a particular delivery route. Initially a "time-study" is conducted to determine how much time particular stops and deliveries should take on a particular route. *Id.* at pp. 17, 24-26. This baseline information is stored in the UPS Central Reporting System ("CRS"). *Id.* at pp. 24-26, 33-34. For example, a delivery stop, i.e., walking from the package car to a customer site and back, has a specific "time allowance." *Id.* at pp. 122-23. Some stops have greater allowances–e.g., a "signature release," where the driver must obtain someone's signature to release a package, takes longer and thus has a greater allowance than a "driver release." *Id.* Additionally, each package delivered to a stop has its own allowance. *Id.* In other words, the driver gets more allowance if he carries ten packages to a doorstep then if carries only two. *Id.*

Next, over the course of completing a particular route, the driver enters, or "scans," data into the DIAD. For example, the driver would enter each delivery stop, each package delivered, his or her break times, and miles driven, among other data. *Id.* at pp. 24-26, Dep. of Raymond Hearne [DE-43] at pp. 80-81. Then, at the end of the workday, the driver's DIAD is uploaded at the distribution center and the route's data, which is entered by the driver that day, is synchronized with the baseline data in the CRS. Dep. of Raymond Hearne [DE-43] at pp. 80-82; Dep. of Phillip Allen [DE-27] at p. 34.

Upon synchronization, the CRS generates a "Planned Day." For example, the data collected by a driver may result in a Planned Day of 8.5 hours, or, if the driver had an unusually

5

busy day, the Planned Day may be as long as 9.5 hours. Dep. of Raymond Hearne [DE-43] at p. 81. The "Paid Day,"in contrast, is the number of hours the driver actually worked over the course of a particular day. Dep. of Phillip Allen [DE-27] at pp. 24-25.

At a Bonus Center, a driver is always paid based on whichever has the higher number of hours–the Planned Day or Paid Day. Dep. of Raymond Hearne [DE-43] at pp. 82-84; Dep. of Phillip Allen [DE-27] at p. 20. If a driver's Paid Day is 8.5 hours, but his Planned Day is 9.2 hours, he earns wages for 9.2 hours. Dep. of Raymond Hearne [DE-43] at pp. 82-84. Alternatively, if the Planned Day was only 8.0 hours, he would still earn wages for the 8.5 hour Paid Day he actually worked. *Id.*

A primary purpose of the "Planned Day" system to encourage efficiency. Decl. of Phillip Allen [DE-29] ¶ 14. The Planned Day is what UPS expects of the average driver. *Id.* Therefore, a driver who works efficiently can "beat the Planned Day" and be rewarded by being paid the difference. Dep. of Phillip Allen [DE-27] at pp. 26, 30.

Another purpose of the Planned Day system is to balance workloads across delivery routes. *Id.* at pp. 26-27. By determining the "Planned Day" on a daily basis for each driver, UPS can identify PCDs with routes that are light or heavier than average. *Id.* UPS can then redistribute workloads among PCDs by shifting portions of busier routes over to lighter routes. *Id.* Balancing workloads is necessary pursuant to the Union Contract, which prohibits UPS from requiring PCDs to work more than 9.5 hours on three consecutive days. *Id.* at p. 27. Thus, the "Planned Day" information enables UPS to shift work away from PCDs with heavier workloads and avoid liability under the Union Contract.

Finally, another purpose of the Planned Day system is to enable UPS to evaluate the

6

performance of PCDs. *Id.* at p. 30. If a driver performs according to UPS standards, he or she should be able to complete a delivery route within the time period established for the Planned Day. *Id.*

## 2. Beating the System by Inflating the Planned Day

UPS contends that a driver may try to beat the system by artificially "inflating" the Planned Day. Decl. of Phillip Allen [DE-29] ¶ 17. In other words, if a driver can make his Planned Day appear to be longer than the actual data would support, he may earn wages for work he did not perform. *Id.* For example, PCDs may deliver several packages to "central delivery points," like a central receiving point within an NC State dormitory. Dep. of Raymond Hearne [DE-43] at pp. 93-94. When delivering several packages to one stop, the DIAD Procedures Guide permits the driver to take credit for only one delivery stop. *Id.* at pp. 68, 97-98, Ex. 5 ("Mail Room/Package Rooms/Dorms . . . are to be recorded as one delivery stop."). *See also* Dep. of Phillip Allen [DE-27] at p. 38. If a driver wanted to inflate the Planned Day, he or she might report each of these packages as a separate delivery stop, thereby falsely inflating the number of stops credited toward the Planned Day. Decl. of Phillip Allen [DE-29] ¶ 17.

UPS also contends that a driver may artificially inflate the Planned Day by exaggerating the number of packages delivered. *Id.* Each separate package has its own time allowance credited toward the Planned Day. *Id.* Thus, if a driver were to retain a package bar code from a package that was previously delivered and "re-scan" it into his DIAD each day for several days, he would continue to get credit for a package he did not actually deliver, thereby falsely inflating his Planned Day. *Id.*

UPS maintains that when false information is submitted through the DIAD, the

7

discrepancies adversely affect UPS operations in several ways, and lists the following as

examples:

- False delivery data results in inaccurate records for customers who use UPS's internet-based electronic package tracking system, and for UPS employees who respond to customer concerns.
- Inflated delivery records resulted in inflated Planned Days for employees at Bonus Centers, allowing them to take credit, and be paid for, work they did not perform.
- Inflated delivery records skew the data on workloads throughout a Center, thus placing a heavier burden on other PCDs who otherwise could have had portions of heavier workloads redistributed.
- Inflated delivery records interfere with UPS's obligations under the Union Contract to redistribute work to ensure workloads are fair.

*Id.* at ¶ 29.

## F. Audit of Raleigh 2 Center

### 1. The External Audit of Raleigh 2 Center's Delivery Records

In March 2005, District Security Manager Fran McMullen ("McMullen") received a

report from UPS's Information Security Department, which is located outside of the East

Carolina District, regarding the results of an external database audit that revealed discrepancies

in Hearne's delivery records. Dep. of Fran McMullen [DE-27] at p. 39; Decl. of Phillip Allen

[DE-29] ¶ 24, Ex. 3. McMullen testified that the report indicated that "the same tracking number

[was] being used over and over again" by Hearne. Dep. of Fran McMullen [DE-27] at p. 40.

Specifically, the report showed that Hearne frequently had re-scanned, and thus taken credit for

the delivery of, the same package "bar code" he had delivered on previous occasions, dating as

far back as the previous year. Decl. of Phillip Allen [DE-29] ¶ 24, Ex. 3. Furthermore, the report

showed that Hearne had recorded delivery of the same packages at different addresses. One bar

code had been re-scanned more than 100 times, another one more than 60 times, and two others

8

more than 30 times each. *Id.*

**2. The March 22, 2005 Internal Audit of Raleigh 2 Center Delivery Records**

In late March 2005, East Carolina District Industrial Engineering Supervisor Phil Allen ("Allen") conducted a random, calendar-drive audit of the package delivery records of the Raleigh 2 Center. Dep. of Phillip Allen [DE-27] at pp. 54, 58-60, 68-70. Allen maintains that at the time he was not aware of the report that had been sent to McMullen by UPS Information Security. Decl. of Phillip Allen [DE-29] ¶ 25.

Allen examined the complete records, including delivery records, package pick-up records, and time cards, of approximately 70 PCDs for the full day of March 22, 2005.[1] Dep. of Phillip Allen [DE-27] at pp. 58-59, 69-70, 76-77. The records consist of about 700-1000 pages of delivery data, and Allen spent somewhere between fourteen and eighteen hours reviewing the records. *Id.* at p. 77. Allen looked for various discrepancies, or "anything outside the ordinary" of UPS's standard package delivery recording methods and procedures. *Id.* at pp. 77-78. The primary purpose of the audit was to determine whether "drivers [were] recording in the DIAD everything properly." *Id.* at p. 58.

The audit conducted by Allen revealed that two PCDs, Hearne and Raymond Whitley[2], had numerous discrepancies in their records. *Id.* at p. 80. Allen noticed several instances where

---

[1] Hearne notes that on March 22, 2005, his immediate supervisor, Dwight King, also had been randomly assigned to conduct a "safety" ride with Hearned. King observed Hearne's activities on that day for at least four hours and, with only one exception, observed that Hearne was doing nothing out of the ordinary. Dep. of Dwight King [DE-44] at pp. 23-24.

[2] Whitley, another long-term UPS PCD, also had a route on the NC State Campus. There was one other driver assigned a route on the NC State Campus, but Allen did not uncover any discrepancies in that driver's records. Dep. of Phillip Allen [DE-27] at pp. 120, 135.

Hearne and Whitley had improperly reported multiple delivery stops at one central receiving point. *Id.* at pp. 81-83, 86-87. Because the number of stops over the course of a day is part of the "Planned Day" calculation, improperly recording multiple stops at one receiving point would artificially inflate the "Planned Day." Decl. of Phillip Allen [DE-29] ¶ 20.

Allen also discovered instances where Hearne had somehow "re-scanned" package bar codes for packages that, according to UPS records, had already been delivered to customers. *Id.* at ¶ 21. UPS notes that each time a package was re-scanned on a subsequent day it resulted in an artificial inflation of the Planned Day. *Id.*

Allen also discovered that Hearne had incorrectly taken double credit for delivery stops relating to packages with incorrect addresses. *Id.* UPS maintains that the DIAD Procedures Guide instructs drivers on how to handle packages with incorrect addresses. *Id.* The Guide provides that the driver may take only one "stop" credit for the delivery to the correct address, specifically warning the driver: "DO NOT count each incorrect address as an additional stop." Dep. of Raymond Hearne [DE-43], Ex. 5. Allen found instances where Hearne was taking stop credit for both the incorrect address and for the actual delivery, which inflated the number of packages delivered. Decl. of Phillip Allen [DE-29] ¶ 22.

Based on the initial audit, it appeared to Allen as if Hearne and Whitley had improperly recorded extra delivery stops and packages delivered to inflate their "Planned Days." *Id.* at ¶ 23. Allen reported the initial finds to his manager, Cecil Hamm, the District Industrial Engineering manager, who then instructed Allen to report the discrepancies to the Security Manager, Fran McMullen. *Id.*, Dep. of Phillip Allen [DE-27] at pp. 95-96.

Upon reviewing the data, McMullen noted that he had recently received the report from

10

UPS Information Security, discussed above, which showed similar discrepancies. Dep. of Fran McMullen [DE-27] at pp. 40-43. McMullen's department had initiated, but not yet completed, its investigation regarding the report from UPS Information Security. *Id.* at pp. 40-45. McMullen advised Allen to give the employees the benefit of the doubt, and to conduct a more extensive audit to determine whether there was a "one day fluke" or actually a consistent pattern of misconduct. *Id.* at pp. 45-47, 50; Dep. of Phillip Allen [DE-27] at pp. 98, 105.

### 3. Focused Audit of the Delivery Records of Hearne and Whitley

In early April, Allen conducted a much more expansive audit of the complete delivery records of Hearne and Whitley for the five-day period of March 28 through April 2, 2005. Dep. of Phillip Allen [DE-27] at pp. 98, 141-42, Exs. 3-6. Allen's audit revealed numerous discrepancies in the records of both men, with the same types of discrepancies occurring consistently every day. Decl. of Phillip Allen [DE-29] ¶ 27. Allen states that examples of the discrepancies he found included: (1) regularly scanning and taking credit for the delivery of the same package delivered on previous days, including scanning delivery of the same package at different addresses on different days; (2) taking credit for multiple stops when delivering multiple packages to a central delivery location, although UPS policy limits credit to one stop in this scenario, and (3) improperly entering multiple delivery stops for misaddressed packages, although UPS policy limits credit to only one delivery stop when redelivering to the correct address. *Id.*

Allen briefed McMullen on the results of the audit. Dep. of Fran McMullen [DE-27] at p. 56. Subsequently, Allen and McMullen met with the Raleigh 2 Center Manager, Rae Sawyer, to present him with the findings of the audits and related investigation. Dep. of Rae Sawyer [DE-

11

## G. Raleigh 2 Center Investigation

After being briefed by Allen on the results of the audit, McMullen wondered how Hearne and Whitley had managed to re-scan the same packages over and over again. Dep. of Fran McMullen [DE-27] at pp. 61-62 ("The magnitude of what occurred here, okay, it boggles–and I'm just speaking from a UPS [perspective]–it boggles the mind how you could have a tracking number a hundred and six times, tracking numbers sixty times . . . ."). Consequently, he instructed a UPS supervisor to search the package cars of Hearne and Whitley, speculating that he might find bar codes that had been removed from previously delivered packages and were being re-scanned in order to inflate the number of deliveries. *Id.* at p. 62.

The supervisor searching the cars did not find excess bar codes, but provided to McMullen a handful of "call-tags" he found in either Hearne's or Whitley's package card. *Id.* at pp. 62-63. A "call-tag" is a form that instructs a driver to go to a customer site and pick up a package for re-delivery elsewhere. Typically, a call-tag is generated by a shipper that has arranged to have UPS pick up a package containing a product for return to it. Dep. of Raymond Hearne [DE-43] at pp. 105-06. The PCD goes to the customer site, picks up the package, and returns it to the distribution center at the end of the day for further processing. *Id.* at pp. 107-09. The DIAD Procedures Guide provides that drivers should "[r]ecord Call Tags when attempted to pick up" and that call-tags "are not counted as additional stops when a delivery is being made to the same stop." *Id.,* Ex. 5 at p. 2

## H. Whitley's Termination

On April 4, 2005, Whitley was called to a meeting with Sawyer, Allen, McMullen, and a

12

Teamsters Union Shop Steward, John Gentry. Dep. of Rae Sawyer [DE-27] at p. 72; Dep. of Fran McMullen [DE-27] at pp. 63-64. According to Sawyer, the purpose of the meeting was to get Whitley's side of the story. Dep. of Rae Sawyer [DE-27] at p. 44. The UPS managers presented the information from Allen's audit. Dep. of Fran McMullen [DE-27] at pp. 63-64. When confronted with the evidence, Whitley did not contest the allegations. Rather, he admitted "[t]hat he was scanning packages over again and . . . taking credit for . . . five stops when he should only be taking credit for one." *Id.* At the conclusion of the meeting, Sawyer made the decision to terminate Whitley for dishonesty and falsification of records. Dep. of Rae Sawyer [DE-27] at pp. 75-76. Whitley did not contest the termination, and subsequently was permitted to resign in lieu of being terminated. Dep. of Raymond Hearne [DE-43] at pp. 190-91.

## I. Hearne's Termination

On April 4, 2005, at the end of his work day, Hearne also was called to a meeting with Sawyer, Allen, McMullen, and Gentry. Dep. of Raymond Hearne [DE-43] at p. 109. At the meeting, Hearne contends that the UPS Managers first confronted him with a stack of call-tags that they claimed were found in the back of Hearne's truck. Aff. of Raymond Hearne [DE-42] ¶¶ 7-8; Dep. of Raymond Hearne [DE-43] at p. 110-11. Hearne also contends that McMullen accused him of using the call-tags to create multiple scans for the purpose of fraudulently inflating his records. Aff. of Raymond Hearne [DE-42] ¶¶ 7-8. Hearne looked through the call-tags and informed McMullen that the addresses of the call-tags did not correspond with his route. *Id.* at ¶ 7; Dep. of Phillip Allen [DE-27] at pp. 109-10; Dep. of Rae Sawyer [DE-27] at pp. 54-55. Hearne maintains that the call-tags had been removed from Whitley's truck, who coincidentally has the same first name as Hearne, drives another route on NC State's main campus, and whose

13

truck was assigned for parking in the space adjacent to Hearne's truck.

After confronting Hearne about the call-tags, McMullen questioned Hearne about UPS records indicating that certain packages had been scanned as delivered on multiple occasions on multiple days. Aff. of Raymond Hearne [DE-42] ¶ 9; Dep. of Raymond Hearne [DE-43] at pp. 112-13; Decl. of Phillip Allen [DE-29] ¶ 32("McMullen asked Hearne about certain packages that had been scanned as delivered on multiple occasions over the course of several days, weeks, months, or longer."). Hearne admitted that he had scanned some packages on multiple occasions, but he explained to McMullen that he previously had been warned by another UPS manager, Wesley Brooks[3], that he was missing scans, Dep. of Raymond Hearne [DE-43] at pp. 112-119. Hearne stated that his supervisors told him to scan each and every barcode on a package. *Id.* at p. 114. Hearne also told McMullen that at least "a time or two," when he was at a delivery site and noticed packages that previously had been delivered, he would rescan those packages. *Id.* Hearne explained that he did this because Brooks, and another supervisor, Alvin Downing, instructed him to scan each and every package in his sight. Aff. of Raymond Hearne [DE-42] ¶ 5. Hearne contends that he asked Brooks whether there was going to be a problem rescanning packages, and Brooks told him that the DIAD would take it into consideration, and there would be no discrepancy at all. Dep. of Raymond Hearne [DE-43] at p. 118.

Hearne also maintains that he told McMullen that the NC State route was unique because of the frequent construction projects, and that he wanted to provide good service to his customers, so he would go out of his way to attempt to locate the new location of those to whom

---

[3] UPS maintains that at the April 4, 2005 meeting, Hearne did not identify the manager who gave him this instruction. The record shows that Wesley Brooks was the Center Manager at the Raleigh 2 Center prior to Sawyer's tenure. Aff. of Raymond Hearne [DE-42] ¶ 5.

14

he was delivering packages. Aff. of Raymond Hearne [DE-42] ¶ 3; Dep. of Phillip Allen [DE-27] at pp. 116-19. Hearne told McMullen that he did not realize he was doing anything improper, but he would follow any procedure they asked him to follow. Dep. of Raymond Hearne [DE-43] at p. 184.

UPS contends that Allen then detailed the difference in pay that Hearne had received as a result of the inflation of his Planned Day. Dep. of Phillip Allen [DE-27] at pp. 134-35. According to Allen's calculations, during the one-week period in which Hearne was audited, he received an additional $297.01 for work he did not perform. *Id.* at p. 134. Aff. of Phillip Allen [DE-29] ¶ 30, Ex. 4. Allen projected that over the course of one year, Hearne could earn approximately $14,969.09 in unearned wages. *Id.*

Everyone but Sawyer and McMullen then was asked to leave the room. Dep. of Phillip Allen [DE-27] at p. 134-35. Sawyer and McMullen reviewed the information McMullen and Allen had compiled, as well as Hearne's answers to their questions. Sawyer also reviewed Hearne's records to see if Hearne had been trained on the DIAD and therefore would have had sufficient warning about the required procedures. Dep. of Rae Sawyer [DE-27] at p. 71. Gentry and Hearne were then asked to come back into the room, and Sawyer informed Hearne that he was being terminated for "dishonesty and falsification of records." Dep. of Raymond Hearne [DE-43] at p. 130; Dep. of Rae Sawyer [DE-27] at pp. 75-76. Sawyer maintains that his decision to terminate Hearne was not based on the "call-tags" that Hearne was confronted with at the April 4, 2005, meeting. *Id.* at p. 62. Rather, the decision was based on Sawyer's conclusion that Hearne "took credit for something that was not his," and attempted to earn "additional money" for work he did not do. *Id.* at pp. 62, 75-76. Sawyer also felt that Hearne's explanations "didn't

15

make any sense." *Id.* at p. 86.

## J. Post-termination procedures

Hearne filed a grievance with the Teamsters Union to contest his termination. Dep. of Raymond Hearne [DE-43] at p. 130. Pursuant to the Union Contract, his grievance first was heard at a "local hearing" on April 5, 2005, attended by him, the Teamsters Union Business Agent Steve Bishop, and UPS District Labor Manager Mike Murphy. Sawyer and McMullen were also in attendance. *Id.* at p. 131. Murphy's job involved reviewing the termination procedure to insure compliance with the Union Contract. Dep. of Mike Murphy [DE-29] at p. 13. At the local hearing, the evidence that had been presented at the April 4, 2005, hearing was again reviewed. *Id.* at p. 39. Hearne continued to maintain that he was following the procedure given to him by his supervisors, but could not give Murphy any names of the supervisors who had issued the instructions. *Id.* at p. 40. Murphy has testified that "the call-tags weren't the issue" at the local hearing. *Id.* at p. 47. At the conclusion of the hearing, Hearne's termination was upheld.

Hearne then appealed his discharge to the Atlantic Region Area Parcel Grievance Committee ("ARAPGC"). Dep. of Raymond Hearne [DE-43] at p. 176. The ARAPGC's panel is comprised equally of UPS and Teamster's Union members. *Id.* at p. 177. The ARAPGC had authority to overturn UPS's decision and reinstate Hearne, and its determination is binding on Hearne. *Id.* at p. 178. The ARAPGC heard Hearne's case in June 2005. Hearne was represented by a Teamster's Union representative and was permitted to present evidence. *Id.* at p. 179. After hearing all the evidence, the ARAPGC denied the grievance and upheld Hearne's termination for dishonesty. *Id.*

16

## K. Hearne's Pension Benefits While Employed by UPS

As a member of the Teamster's Union, Hearne was eligible to participate in a pension program managed by the Teamsters, the Central States Health and Welfare Fund ("Central States Plan"). *Id.* at p. 39. UPS has no management authority with respect to Central States Plan. *Id.* at p. 204-05. Pursuant to the Union Contract, UPS is responsible only for funding the pension benefit by contributing a set dollar amount each month to each Teamster's account with Central States. *Id.* at pp. 39, 205. UPS contributes the same dollar amount each month for each Teamster in the local union, regardless of that Teamster's age or seniority. *Id.* at pp. 39, 205.

## III. STANDARD OF REVIEW

Summary judgment is appropriate when there exist no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Any analysis of the propriety of summary judgment must focus on both the materiality and the genuineness of the fact issues. *Ross v. Comm. Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985). The "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-48. The question of whether a fact issue is material is determined by reference to the substantive law, and "[o]nly disputes over facts that might affect the outcome of the suit under

17

the governing law will properly preclude the entry of summary judgment." *Id.* at 248.

> As the Court explained in *Celotex*;
>
> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case renders all other facts immaterial. The moving party is "entitled to judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex*, 477 U.S. at 322-23. Thus, the moving party may meet its burden as to an issue for which the non-movant will bear the burden of proof at trial by demonstrating that there is a lack of evidence to support the non-moving party's case. *Id.* at 325.

Furthermore, the proper standard for summary judgment mirrors that for directing a verdict under Rule 50(a) of the Federal Rules of Civil Procedure, whereby the trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict. *Anderson*, 477 U.S. at 250. "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict -- 'whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed.' " *Id.* at 252 (internal citations omitted).

## IV. ANALYSIS

Hearne alleges that he was terminated from employment in violation of the ADEA, NCEEPA, and ERISA. Hearne also alleges that UPS made a slanderous *per se* statement against

him, and was negligent.[4] The court will examine each parties' arguments as to each claim in turn.

## A. ADEA Claim

Hearne contends that after almost thirty years of performing his job satisfactorily, UPS terminated him for mere discrepancies in his delivery records, without an adequate investigation and without an opportunity to change his behavior. Hearne contends that his termination was made on the basis of his age, and thus was in violation of the ADEA.

The ADEA makes it "unlawful for an employer . . . to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). Application of the ADEA is limited to "individuals who are at least 40 years of age." 29 U.S.C. § 631(a). The touchstone of an ADEA action is that the adverse employment decision would not have been made, but for plaintiff's age. In other words, the plaintiff's age must have been a determining factor in the employer's decision. *See Reaves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 141 (2002). The plaintiff in an ADEA case "bears the burden of proving that age was a determining factor in the relevant employment decision." *Mereish v. Walker*, 359 F.3d 330, 334 (4th Cir.2004).

The Fourth Circuit Court of Appeals has recognized that plaintiffs may establish a claim for age discrimination through two avenues of proof: "[F]irst, through evidence showing that age

---

[4] In his Complaint, Hearne also alleged that UPS was liable for intentional infliction of emotional distress. He did not respond to UPS's argument in support of summary judgment on the claim of intentional infliction of emotional distress, apparently conceding he has failed to state a claim. Accordingly, for the reasons stated in UPS's Memorandum in Support of Motion For Summary Judgment, UPS's Motion for Summary Judgment is ALLOWED with respect to intentional infliction of emotional distress claim. *See* Fed. R. Civ. P. 56(e)("If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.").

bias motivated the employment decision under the so-called 'mixed-motive' method, and second, through circumstantial evidence of discrimination under the 'pretext' method established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973), and its progeny." *Id.* (citing *Hill v. Lockheed Martin Logistics Mgmt., Inc.,* 354 F.3d 277, 284-85 (4th Cir. 2004) (en banc)). Hearne relies upon the *McDonnel Douglas* pretext method to establish his claim.

Under the *McDonnell Douglas* burden shifting scheme, Hearne first must establish a prima facie case of discrimination by a preponderance of the evidence. *See McDonnell Douglas*, 411 U.S. at 802.. If Hearne establishes a prima facie case of discrimination, the burden shifts to UPS to produce a legitimate, nondiscriminatory reason for the adverse employment action. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981). If UPS meets its burden of production, the presumption of discrimination created by the prima facie case disappears from the case, and Hearne then must prove that UPS's articulated reason was a pretext for unlawful discrimination. *See id.* at 253-55. In light of *Reaves v. Sanderson Plumbing Products, Incorporated*, 530 U.S. 133, (2000), a plaintiff is no longer required to show pretext *plus* some additional evidence of discrimination. *Id.* at 148, *see Rowe v. Marley Co.*, 233 F.3d 825, 830 (4th Cir. 2000). Thus the burden to demonstrate pretext "merges with the ultimate burden of persuading the court that [Hearne] has been the victim of intentional discrimination." *Id.* at 256.

In this case, there appears to be some disagreement as to what precisely Hearne must show in order to establish a prima facie case of discrimination. For his part, Hearne contends that he must show that (1) he was in the age group protected by the ADEA; (2) he was discharged; (3) at the time of discharge, he was performing his job at a level meeting his employer's legitimate expectations; and (4) his discharge occurred under circumstances that raise

20

a reasonable inference of age discrimination. Pl's Resp. [DE-41] at unnumbered p. 8 (citing *Halperin v. Abacus Tech. Corp.*, 128 F.3d 191, 201 (4th Cir. 1997)). The parties agree that under this formulation of the prima facie case, Hearne has established by the preponderance of the evidence the first two factors: he was terminated from employment by UPS, and at the time of his termination, he was 48 years old. The parties disagree with regard to the last two factors and specifically over whether Hearne, at the time of his discharge, was performing his job at a level meeting UPS's legitimate expectations.

Hearne maintains that he has established the third element by a preponderance of the evidence by pointing to the fact that he had only been disciplined once during his career at UPS, which spanned over thirty years.[5] UPS, however, argues that Hearne cannot establish this element because he was terminated for not meeting UPS's legitimate employment expectations: in UPS's eyes, he was being dishonest. This case therefore presents "a rather perplexing situation that arises where, as here, an employee charges his employer with seizing upon an actual or perceived failure to meet legitimate expectations as pretext for unlawful discrimination." *Cupples v. AmSan, LLC*, No. 3:04-CV-574W, 2007 WL 1075178, at *5 (W.D.N.C. March 30, 2007). In such cases, "the proof necessary to establish the legitimate expectations element begs the ultimate factual question at issue (*i.e.*, whether the employee-s failure to live up to the employer's reasonable expectations was the genuine reason for the

---

[5] Hearne also points to 74 pages of apparent letters written by his former customers on the NC State route, expressing their satisfaction with Hearne's efforts and service. As UPS notes, however, none of these letters have been authenticated by their authors. The Fourth Circuit has noted that "a letter 'must be attached to an affidavit and authenticated by its author in the affidavit or a deposition.'" *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)(quoting 10A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2722(1983 & 1993 Supp.)).

21

termination or merely a pretext for impermissible discrimination)." *Id.* at \*6. The Fourth

Circuit, in *Warch v. Ohio Casualty Insurance Company*, 435 F.3d 510 (4th Cir. 2006), stated that

in such cases it is appropriate to consider, at the prima facie stage, the defendant's evidence that

the plaintiff was not meeting legitimate performance expectations. *Id.* at 515-17. Still, courts

have recognized that the approach espoused in *Warch* runs the risk of "improperly conflating the

three distinct stages of the *McDonnell Douglas* analysis." *Cupples v. AmSan.* at \*6. *See also*

*Cline v. Catholic Diocese of Toledo*, 203 F.3d 651, 660-61 (6th Cir. 2000)(determining that

district court "conflated the distinct stages of the *McDonnell Douglas* inquiry by using the

employer's legitimate non-discriminatory reason as a predicate for finding that employee failed

to meet qualifications of employer and therefore failed to establish a prima facie case of

discrimination).

Fortunately, the Fourth Circuit also has noted that in the context of disciplinary action,

the traditional prima facie case espoused in *McDonnell Douglas*, and advocated by Hearne in this

case, is not wholly applicable. *See Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir.

1985)(stating that "the *McDonnell Douglas* prima facie model is less useful" in the context of a

discriminatory disciplinary decision). Rather, the Fourth Circuit states that one should compare

the plaintiff's conduct and resulting disciplinary action with the treatment of others outside the

protected class. *See id.* at 1106. Thus, an employee may establish a prim facie case of

discrimination by showing that (1) he is a member of a protected class; (2) the prohibited conduct

in which he engaged was comparable in seriousness to misconduct of employees outside the

protected class; and (3) he suffered more severe discipline for his misconduct as compared to

those employees outside the protected class. *Taylor v. Virginia Union Univ.*, 193 F.3d 219, 234

22

(4th Cir. 1999)(en banc), *abrogated on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). UPS contends that the prima facie case as envisioned in *Taylor* is most applicable to this case, and the court agrees.

Consequently, Hearne must establish, by a preponderance of the evidence, (1) that he engaged in prohibited conduct similar to that of a younger person, and (2) that disciplinary measures used against him were more severe than those used against the younger person. *See id.* Although "precise equivalence" between employees' actions need not be shown, the relevant conduct still must be of "comparable seriousness" given the relative culpability of the comparable employees and the harm caused. *Moore*, 754 F.2d at 1107 (citing *McDonald v. Santa Fe Transp. Co.*, 427 U.S. 273, 283 n.11 (1976)).

The only evidence Hearne can point to is his own unsworn affidavit, wherein he avers that "[i]n over thirty years of employment with UPS, I am not aware of nor have I ever heard of any other employee at the Raleigh Center being terminated without a warning or opportunity to change his or her behavior, nor am I aware of any person who was not reinstated after being terminated the first time." Aff. of Raymond Hearne [DE-42] ¶ 11. Notably missing from Hearne's assertion is any mention of his knowledge of another Raleigh Center employee who engaged in conduct that UPS found dishonest, or other analogous behavior. Without some evidence regarding the alleged misdeeds of other UPS employees who were treated more leniently, Hearne cannot establish his prima facie case.

Moreover, the record establishes that the only other person to be accused of falsifying delivery records, Ray Whitley, was told that he would be terminated, but was permitted to resign when he admitted to the misconduct. Dep. of Raymond Hearne [DE-43] at pp. 190-91. The

23

court notes that Whitley was younger than Hearne. *Id.* at p. 190. In his deposition, Hearne does reference two UPS PCDs, who were terminated from employment at the Chapel Hill Center for falsifying mileage records, but later reinstated. Dep. of Raymond Hearne [DE-43] at pp. 195-98. *See also* Decl. of Richard Swayne [DE-30] ¶¶ 5-6. The record shows, however, that these employees were only reinstated only as a result of the Union grievance process, and not because of an independent voluntary decision on the part of UPS. Other courts have concluded, and this court agrees, that the fact that another employee is reinstated as a result of a Union grievance process is not usually probative of discrimination. *See, e.g., Hiatt v. Rockwell Int'l Corp.*, 26 F.3d 761, 770-71 (7th Cir. 1994)("In order to be a relevant comparison . . . the company . . . must have voluntarily reinstated these employees. Here the company terminated the two employees and was forced to rehire them when the company lost in arbitration.").

Even if this court assumes that Hearne has proffered evidence establishing a prima facie case by the preponderance of the evidence, UPS has met its burden of production by stating a legitimate, non-discriminatory reason for terminating Hearne: UPS believed that Hearne engaged in dishonest behavior and falsified delivery records. Consequently, the burden shifts to Hearne to show that the "explanation is unworthy of credence or by offering other forms of circumstantial evidence sufficiently probative of age discrimination." *Mereish v. Walker*, 359 F.3d 330, 336 (4th Cir.2004) (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981)). This Hearne has not done.

Instead, Hearne essentially argues that because he had worked for UPS for over thirty-years and had only one record in his disciplinary file, Sawyer should have accepted his explanations for why his delivery records indicated that certain packages had been scanned as

24

delivered on multiple occasions over the course of several days, weeks, months, or longer. Hearne's assertions, however, simply are not evidence from which the fact finder could conclude that UPS's stated reason for ending his employment is unworthy of credence. Indeed, reviewing the record as a whole, it is undisputed that: (1) UPS has consistently maintained that Hearne was terminated for dishonesty and falsification of records; (2) UPS took the same action against Whitley, a younger PCD implicated in the same investigation, and (3) Hearne has admitted that he has no reason to say that the delivery records or incorrect or inaccurate. *See* Dep. of Raymond Hearne [DE-43] at p. 146 ("I mean, what was on the delivery records, we have to assume that that was correct."). In sum, he has not proffered sufficient evidence from which a jury could conclude that UPS's reason for terminating his employment is false.

Because Hearne has failed to proffer sufficient evidence from which to prove a prima facie case of age discrimination, or to prove that UPS' stated reason for terminating his employment is a pretext for discrimination, summary judgment is appropriate as to Hearne's age discrimination claim.

## B. ERISA Claim

Hearne also alleges that UPS intentionally discriminated against him for the purpose of interfering with his right to protected benefits. Section 510 of ERISA makes it unlawful "to discharge . . . or discriminate against a participant . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled." 29 U.S.C. § 1140. As the Fourth Circuit has recognized, "employees waiting to vest in a qualified pension plan have a cause of action against an employer who discharges them for purposes of blocking their vesting in the company's pension plan." *Conkwright v. Westinghouse Elec. Corp.*, 933 F.2d 231, 236

25

(4th Cir. 1991). A plaintiff asserting a claim under § 510 must prove specific intent by his employer to interfere with his pension rights. *Id.* at 238-39. This is because

> ERISA guarantees that no employee will be terminated where the purpose of the discharge is the interference with one's pension rights. Consequently, it is necessary to separate the firings which have an incidental, albeit important, effect on an employee's pension rights from the actionable firings, in which the effect of the firing on the employer's pension obligation was a motivating factor in the firing decision. Otherwise, an employee could sue under § 510 for being negligently terminated, and that goes too far to vindicate the pension rights of employees.

*Id.* at 238.

Because plaintiffs under ERISA confront similar proof problems as those encountered by Title VII and ADEA plaintiffs, the Fourth Circuit has concluded that "the *McDonnell Douglas* scheme of presumptions and shifting burdens of production is appropriate in the context of discriminatory discharge claims brought under § 510 of ERISA." *Id.* at 239. Thus, the schemes and shifting burdens that the court discussed with regard to Hearne's ADEA claim also apply to his ERISA claim.

Even if this court assumes that Hearne has proffered sufficient evidence establishing a prima facie case, he still has not proffered evidence from which a reasonable factfinder could conclude that UPS's reason for terminating his employment was a pretext. As this court already has discussed, Hearne relies primarily on his own assertions and conclusions. These assertions carry very little weight, especially when viewed in light of Hearne's deposition testimony. Hearne admitted that he did not believe that Rae Sawyer was thinking about money UPS could save toward pension benefits when he made the decision to terminate his employment, nor did Hearne have any evidence that any at UPS was aware when his pension benefits would vest.

Dep. of Raymond Hearne [DE-43] at pp. 207, 210. Moreover, the record establishes that UPS had no incentive to interfere with Hearne's pension benefits because, even if Hearne was terminated, UPS would be responsible for paying the same amount of money to fund the pension of Hearne's replacement under the Union Contract. Decl. of Phillip Allen [DE-29] ¶ 3, Ex. 1 at p. 202 ("[T]he employer shall contribute to the Central States . . . Pension Fund for each employee covered by this Agreement who has been on the payroll thirty (30) days or more the sum: $166.00 per week."). Given such evidence, no reasonable trier of fact could find that UPS terminated Hearne with the intention of interfering with his pension rights. Accordingly, summary judgment is appropriate as to Hearne's ERISA claim.

## C. Wrongful discharge in violation of public policy

Hearne also alleges that he was terminated in violation of North Carolina public policy as articulated in the NCEEPA.[6] Both parties agree that Hearne's NCEEPA claim rises and falls with his ADEA claim. This court has already determined that summary judgment is appropriate as to Hearne's ADEA claim; for the same reasons, summary judgment is also appropriate as to Hearne's claim for wrongful discharge in violation of public policy. *See Henson v. Liggett Group, Inc.*, 61 F.3d 270, 277 (4th Cir. 1995)("Because plaintiff relies upon the same evidence to support her state law claim for age discrimination under the [NC]EEPA, as she did in the ADEA

---

[6] The NCEEPA states, in part, the following:
  It is the public policy of this State to protect and safeguard the right and opportunity of all persons to seek, obtain and hold employment without discrimination or abridgement on account of race, religion, color, national origin, age, sex or handicap by employers which regularly employ 15 or more employees.

N.C. Gen. Stat. §143.-422.2.

context, the district court correctly granted summary judgment to Liggett on Henson's state law claim.").

**D. Slander _Per Se_**

In his Complaint, Hearne alleges: "In falsely accusing Plaintiff with defamatory statements about him with respect to his trade, Defendant has made _per se_ slanderous statements toward Plaintiff" which "directly touched Plaintiff's integrity and capacity to perform his occupation, and necessarily, as witnessed by his termination, had a derogative and hurtful effect on his occupation as a delivery driver." Compl. [DE-1] ¶¶ 27-28.

From these allegations, UPS assumed that Hearne was referencing statements made during the April 4, 2005, meeting where UPS managers confronted him with delivery records and later terminated his employment. Consequently, during the deposition of Hearne, counsel for UPS focused his questions on alleged statements made during the investigation and later hearings. _See_ Dep. of Raymond Hearne [DE-43] at pp. 46-49. When asked whether his "defamation claim is focused on UPS' allegation about misusing call tags," Hearne responded: "That's correct. That, and what was said about them at the meeting." _Id._ at p. 49. Accordingly, UPS moved for summary judgment on Hearne's claim for slander _per se_, arguing that the statements made by McMullen at the April 4, 2005 meeting were not actionable as slander _per se_; that UPS was entitled to the defense of truth, and that the statements were protected by a qualified privilege.

In response, Hearne alleges and argues that "employees of UPS informed members of the NC State community which Hearne had served faithfully that Hearne was terminated for committing acts of 'dishonesty' " without determining whether Hearne acted "intentionally."

28

Hearne maintains that a finding that he acted "intentionally" is necessary before his actions could be deemed "dishonest." In support of this allegation, Hearne cites to seventy-four pages of letters written on his behalf by various N.C. State personnel. Hearne makes no mention of the statements made at the April 4, 2005, meeting.

UPS contends that summary judgment still is appropriate as to Hearne's newly articulated basis for his slander *per* se claim. The court agrees. At bottom, Hearne has proffered no competent evidence in support of the claim. Instead, he relies solely upon the seventy-four pages of *unauthenticated* letters from N.C. State personnel. As this court already has explained, however, "a letter 'must be attached to an affidavit and authenticated by its author in the affidavit or a deposition.' " *Orsi v. Kirkwood*, 999 F.2d 86, 92 (4th Cir. 1993)(quoting 10A CHARLES A. WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 2722(1983 & 1993 Supp.)). Because Hearne has proffered absolutely no competent evidence in support of his claim for slander *per se*, UPS's motion for summary judgment is ALLOWED as to that claim.

### E. Negligence claim

In Hearne's fifth claim for relief, he alleges that UPS had a "duty and obligation toward Plaintiff to consistently and fairly apply its policies for investigating allegations of wrongdoing by its employees," and that UPS "breached that duty to Plaintiff by its inadequate and negligently-conducted investigation, and subsequent termination of Plaintiff based on knowingly false conclusions of that investigation." Compl. [DE-1] ¶¶ 31-32. UPS, in its Memorandum in support of its Motion for Summary Judgment, first argued that summary judgment is appropriate because Hearne's claim had no basis in statutory or common law. Specifically, UPS argued that it had been unable to find any published court decision finding that an employer owes a separate

29

duty to consistently and fairly apply its policies to its employees. *See* Mem. in Support of Mot. for Summ. J. [DE-] at p. 32.

In response, Hearne argues that the Union Contract imposed obligations upon UPS with regard to its Union employees. Specifically, that UPS could discharge a member of the Union, without written notice, only for specified misconduct, including "dishonesty." Hearne argues that UPS therefore "had a duty to make the employee activities upon which it bases its decision to terminate [employment] are legitimate." Pl.'s Resp. [DE-41] at unnumbered p. 14. Hearne posits that the record suggests that his employment was terminated on the basis of the "call tags" found in another driver's truck, and that "such an action would amount to wrongful discharge in bad faith to UPS's obligation to its employees." *Id.* at unnumbered p. 15.

UPS notes in its Reply, and this court agrees, that North Carolina does not recognize a claim for wrongful discharge in bad faith. *See, e.g., Amos v. Oakdale Knitting Co.*, 331 N.C. 348, 359, 416 S.E.2d 166, 173 (1992)("The final issue before the Court is whether *Coman* [*v. Thomas Mfg., Inc.*, 325 N.C. 172, 381 S.E.2d 445 (1989)] recognized a separate and distinct claim for bad faith discharge. We hold it did not."). Moreover, even if North Carolina did recognize such a claim, the court concludes that it would be preempted by the Labor Management Relations Act of 1947, 29 U.S.C. § 185(a) (the "LMRA").

Section 301 of the LMRA provides:

> Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties.

29 U.S.C. § 185(a). As the Fourth Circuit Court of Appeals has observed, "Section 301 not only

provides federal courts with jurisdiction over employment disputes covered by collective bargaining agreements, but also directs federal courts to fashion a body of federal common law to resolve such disputes." *McCormick v. A T & T Tech., Inc.*, 934 F.2d. 531, 534 (4th Cir. 1991) (citing *AllisChalmers Corp. v. Lueck*, 471 U.S. 202, 209 (1985)). Moreover, any state-law cause of action for violation of collective bargaining agreements is "entirely displaced by federal law under § 301." *United Steel Workers of America v. Rawson*, 495 U.S. 362, 367 (1990). "State Law is thus pre-empted by § 301 in that only the federal law fashioned by the courts under § 301 governs the interpretation and application of collective bargaining agreements." *Id.*

The Fourth Circuit has counseled that when determining whether a state law claim is preempted, "the question in preemption analysis is not whether the source of the cause of action is state law, but whether resolution of the cause of action requires interpretation of a collective bargaining agreement. *McCormick*, 934 F.2d at 535. Accordingly, "[s]tate tort claims are preempted where reference to a collective bargaining agreement is necessary to determine whether a 'duty of care' exists or to define 'the nature and scope of that duty, that is, whether, and to what extent, the [employer's] duty extended to the particular responsibilities alleged by [the employee] in h[is] complaint." *Id.* at 536 (quoting *Int'l Bhd. of Elc. Workers v. Hechler*, 481 U.S. 851, 862(1987)).

In this case, Hearne himself argues that UPS's alleged duty to Hearne arises from the Union Contract, a collective bargaining agreement. *See* Pl.'s Resp. [DE-41] at unnumbered p. 14 ("UPS accepted responsibilities vis-a-vis its Union employees as part of the collective bargaining agreement. . . . Having agreed to terminate an employee without warning for only five enumerated reasons, UPS had a duty to make sure the employee activities upon which it bases its

decision to terminate are legitimate."). Consequently, the Union Contract necessarily would have to be examined to determine whether a duty of care existed. Under these circumstances, the court must conclude that Hearne's fifth claim for relief is preempted by § 301 of the LMRA.

Finally, even if Hearne's fifth claim for relief could be construed as stating a claim under § 301 itself, such a claim would be time-barred. The Supreme Court has determined that a six-month statute of limitations applies to actions for breach of a collective bargaining agreement brought by an employee against his employer under the LMRA. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 169 (1983). This action was initiated in March 2006, more than six months after Hearne's discharge in April 2005 and the grievance panel's decision in June 2005. Consequently, even if Hearne has alleged a claim under § 301, such a claim is untimely.

For the foregoing reasons, summary judgment is appropriate as to Hearne's fifth claim for relief.

## V. CONCLUSION

UPS's Motion for Summary Judgment [DE-24] is ALLOWED in its entirety. The Clerk of Court is DIRECTED to close this case and remove the matter from the undersigned's trial calendar.

SO ORDERED.

The 2nd day of November, 2007.

*James C. Fox*

James C. Fox
Senior United States District Judge

32